1
**REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
2
mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
3
adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
4
Newport Beach, CA 92660
Phone:  (949) 975-0512
5
Fax: (949) 208-2839

6
**LIFSHITZ LAW LLP**
Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7
jml@jlclasslaw.com
1190 Broadway
8
Hewlett, NY 11557
Phone: (516) 493-9780
9
Fax: (516) 280-7376

10
Attorneys for Plaintiff

11
UNITED STATES DISTRICT COURT

12
NORTHERN DISTRICT OF CALIFORNIA

13

14
JOSEPH NAPOLI, Derivatively on Behalf of
Nominal Defendant
CHEMOCENTRYX, INC.,

15
                        Plaintiff,

16
v.

17
THOMAS J. SCHALL, JOSEPH M. FECZKO,
18
RITA I. JAIN, SUSAN M. KANAYA, HENRY A.
MCKINNELL, JR., GREGORY M. PARKER, and
19
JAMES L. TYREE,

20
                        Defendants,
and
21
CHEMOCENTRYX, INC.,
22

23
                        Nominal Defendant.

Case No: 3:22-cv-00499

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**Demand for Jury Trial**

24

25

26

27

28

Plaintiff Joseph Napoli ("Plaintiff"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant ChemoCentryx, Inc. ("ChemoCentryx" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below): (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) violations of Section § 14(a) of the Exchange Act; (iii) breaches of fiduciary duties; and (iv) unjust enrichment.  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by ChemoCentryx and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on ChemoCentryx's website; (c) review of the pleadings and other documents in the securities class action captioned *Homyk v. ChemoCentryx, Inc., et al.*, Case No. 21-cv-03343-JST (N.D. Cal.) (the "Securities Class Action"); and (d) review of other publicly available information concerning ChemoCentryx and the Defendants.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant ChemoCentryx against certain of the Company's current and former executive officers and directors seeking to remedy the Defendants' violations of the Exchange Act for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately November 26, 2019 to the present (the "Relevant Period").[1]

2.      ChemoCentryx is a biopharmaceutical company focused on the development and commercialization of new medications targeting inflammatory disorders, autoimmune diseases, and cancer. The Company commenced operations in 1997. ChemoCentryx's lead drug candidate is avacopan, which the Company describes as "a potential first-in-class, orally-administered molecule that employs a novel for the treatment of patients with ANCA vasculitis. ChemoCentryx common stock

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports, proxies, and other public filings and releases from approximately November 26, 2019 to May 3, 2021; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

trades on the NASDAQ stock exchange under the ticker symbol "CCXI." The Company is headquartered in San Carlos, CA.

3.      After the market closed on November 25, 2019, ChemoCentryx announced "Positive Topline Data from Pivotal Phase III ADVOCATE Trial Demonstrating Avacopan's Superiority Over Standard of Care in ANCA-Associated Vasculitis." In this announcement, ChemoCentryx stated that the ADVOCATE Phase III Trial "met both of its primary endpoints," and that "[t]he topline safety results revealed an acceptable safety profile in this serious and lifethreatening disease."

4.      Moreover, Defendant Thomas J. Schall, the Company's President, CEO, and Chairman of the Board of Directors, stated that "[t]hese results exceed our expectations. Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients. This day we have for the first time demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy; a therapy which the present findings may make obsolete. Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over."

5.      On this news, ChemoCentryx shares soared from their November 25, 2019 close of $8.06 per share to a November 26, 2019 opening price of $34.82 – more than quadrupling the share price.

6.      Over the next several months, as alleged herein, Defendants continued to repeatedly laud the results of the ADVOCATE Phase III trial, as well as the safety profile of avacopan for the treatment of ANCA-associated vasculitis. On July 9, 2020, ChemoCentryx announced that it had filed its New Drug Application ("NDA") for avacopan, and on September 17, 2020, the Company announced that the FDA had accepted the NDA for review. During the Class Period, ChemoCentryx shares traded to over $70.00 each.

7.      On May 4, 2021, the United States Food and Drug Administration (the "FDA") published a Briefing Document concerning ChemoCentryx's NDA #214487 for avacopan. In this Briefing Document, the FDA wrote that ***"[c]omplexities of the study design, as detailed in the briefing document, raise questions about the interpretability of the data to define a clinically meaningful***

1    *benefit of avacopan and its role in the management of AAV.*" (Emphasis added). The FDA Briefing

2    Document continued that "[a]lthough primary efficacy comparisons were statistically significant, *the*

3    *review team has identified several areas of concern, raising uncertainties about the interpretability*

4    *of these data and the clinical meaningfulness of these results* . . . ." (Emphasis added). In the Briefing

5    Document, the FDA also raised serious safety concerns with avacopan for the treatment of ANCA-

6    associated vasculitis.

7          8.    On this news, the price of ChemoCentryx common stock plummeted over 45% in one day,

8    down from its May 3, 2021 closing price of $48.82 to a May 4, 2021 close of $26.63 per share, on

9    unusually high trading volume. Shares traded intraday as low as $17.79 each. This represents a one-day

10   loss of approximately $1.5 billion in market capitalization.

11         9.    Throughout the Relevant Period and in violation of the Exchange Act, Defendants made

12   materially false and/or misleading statements, as well as failed to disclose material adverse facts to

13   investors. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) the

14   study design of the Phase III ADVOCATE trial presented issues about the interpretability of the trial

15   data to define a clinically meaningful benefit of avacopan and its role in the management of ANCA-

16   associated vasculitis; (2) the data from the Phase III ADVOCATE trial raised serious safety concerns

17   for avacopan; (3) these issues presented a substantial concern regarding the viability of ChemoCentryx's

18   NDA for avacopan for the treatment of ANCA-associated vasculitis; and (4) as a result of the foregoing,

19   Defendants' public statements were materially false and misleading at all relevant times.

20         10.   As a result of the above-described misconduct, the Company and its shareholders have

21   been severely harmed by the false and misleading statements concerning the Company's ADVOCATE

22   trial.

23                                       **JURISDICTION AND VENUE**

24         11.   This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because

25   the claims arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (15

26   U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

27         12.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28

28   U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

13.    Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.  Also, the Company's principal executive offices are located in this District.

## THE PARTIES

14.    Plaintiff holds shares of ChemoCentryx, has held shares of the Company at the time of the wrongdoing alleged herein, and has held shares of ChemoCentryx continuously since that time.

15.    Nominal Defendant ChemoCentryx Corporation ("ChemoCentryx" or the "Company") is a Delaware corporation with its principal executive offices at 835 Industrial Road, San Carlos, California 94070. The Company's common stock trades on the NASDAQ stock exchange under the symbol "CCXI."

16.    Defendant Thomas J. Schall ("Schall") has been the Company's President and Chief Executive Officer ("CEO") since 1997 and Chairman of the Board of Directors since April 2021.  The Company admits that Defendant Schall is not an independent director.  In his role as CEO of the Company for fiscal years 2019 and 2020, Defendant Schall received $3,341,856 and $8,366,309 in total compensation, respectively.

17.    Defendant Thomas A. Edwards ("Edwards") has been a member of the Company's Board since July 2015. Defendant Edwards is a member of the Board's Audit, Compensation, and Nominating and Governance Committees. In his role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Edwards received $276,049 and $503,112 in total compensation, respectively.

18.    Defendant Joseph M. Feczko ("Feczko") has been a member of the Company's Board since April 2012. Defendant Feczko is a member of the Board's Audit, Compensation, and Nominating and Governance Committees. In his role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Feczko received $253,708 and $482,112 in total compensation, respectively.

19.    Defendant Rita I. Jain ("Jain") has been the Company's Executive Vice President and Chief Medical Officer since October 2021, and a member of the Company's Board since March 2019. Defendant Jain is a member of the Board's Audit, Compensation, and Nominating and Governance

Committees. In her role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Jain received $434,846 and $478,112 in total compensation, respectively.

20. Defendant Susan M. Kanaya ("Kanaya") has been the Company's Executive Vice President and Chief Financial and Administrative Officer since October 2016, and a member of the Company's Board since March 2021. Prior to that, Defendant Kanaya served as the Company's Senior Vice President, Finance, and Chief Financial Officer from January 2006 to October 2016. In her role as Chief Financial and Administrative Officer of the Company for fiscal years 2019 and 2020, Defendant Kanaya received $1,584,365 and $2,920,432 in total compensation, respectively.

21. Defendant Henry A. McKinnell, Jr. ("McKinnell") has been a member of the Company's Board since October 2016. Defendant McKinnell is a member of the Board's Audit, Compensation, and Nominating and Governance Committees. In his role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant McKinnell received $257,697 and $488,112 in total compensation, respectively.

22. Defendant Geoffrey M. Parker ("Parker") has been a member of the Company's Board since December 2009. Defendant Parker is a member of the Board's Nominating and Governance Committee. In his role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Parker received $231,049 and $458,112 in total compensation, respectively.

23. Defendant James L. Tyree ("Tyree") has been a member of the Company's Board since June 2012. Defendant Tyree is a member of the Board's Audit, Compensation, and Nominating and Governance Committees. In his role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Tyree received $259,401 and $485,193 in total compensation, respectively.

24. Defendants Schall, Edwards, Feczko, Jain, Kanya, McKinnel, Parker, and Tyree are collectively referred to herein as the "Individual Defendants."

25. The Individual Defendants, along with ChemoCentryx, are collectively referred to herein as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers, directors, and/or fiduciaries of ChemoCentryx, and because of their ability to control the business and corporate affairs of ChemoCentryx, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage ChemoCentryx in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of ChemoCentryx and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27.     Each director and officer of the Company owes to ChemoCentryx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

28.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

29.     Pursuant to the Audit Committee Charter of ChemoCentryx,[2] the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company on behalf of the Board and to report the results of its activities to the Board."

30.     In addition, the Audit Committee is responsible for:

(ii) The Committee shall review and discuss with management and the independent auditor: (A) accounting principles and financial statement presentations, including any changes in the Company's selection or application of accounting principles, significant estimates and accruals, the reasonableness of significant judgments, and, to the extent applicable, issues as to the adequacy and effectiveness of the Company's internal controls and any special remedial actions adopted in light of significant deficiencies or material control deficiencies (including a discussion of management's process for assessing the effectiveness of internal controls under Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act")); (B) any analyses prepared by management or the

---

[2] https://ir.chemocentryx.com/static-files/d56f5ee7-c48d-412f-b2b3-98cabc5c3125

independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative methods under generally accepted accounting principles in the United States ("GAAP") on the Company's financial statements; and (C) the effect of regulatory and accounting initiatives on the financial statements.

(iii) The Committee shall review and discuss with management and the independent auditor any material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities of which the Committee is made aware that do not appear on the financial statements of the Company and that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues and expenses.

(iv) The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also discuss the results of the annual audit and any matters required to be communicated to the Committee by the independent auditor under the standards of the PCAOB.

(v) The Committee shall review with the independent auditor any problems or difficulties the independent auditor may have encountered during the course of the audit work, including special audit risks, materiality and any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the independent auditor are: (A) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); (B) any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; and (C) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company. The Committee shall obtain from the independent auditor a report required by Section 10A(b) of the Exchange Act if an illegal act is discovered in the audit.

(vi) The Committee shall discuss with the independent auditor the report that such auditor is required to make to the Committee regarding: (A) all accounting policies and practices to be used that the independent auditor identifies as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent auditor, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (C) all other material written communications between the independent auditor and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditor's engagement letter, independent auditor's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

31.     The Individual Defendants, as officers or directors of the Company, were also bound by the Company's Code of Business Conduct and Ethics ("the "Code") which, according to the Code, sets out basic principles to guide all officers and directors, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

32.     Regarding basic general principles of conduct, the Code requires that:

> This Code of Business Conduct and Ethics (the "Code") contains general guidelines for conducting the business of ChemoCentryx, Inc. (the "Company") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, we adhere to these higher standards.

33.     Concerning accuracy of the Company's financial reports and other public communication, the Code requires that:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> The Company's principal financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

34.     Concerning compliance with laws and regulations, the Code requires that:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job

position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor, the Company's Chief Financial Officer.

35. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of ChemoCentryx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

37. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the Company.

38. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

39. To discharge their duties, the officers and directors of ChemoCentryx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of ChemoCentryx were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how ChemoCentryx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that ChemoCentryx was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

40.    Each of the Individual Defendants, by virtue of their position as a director and/or officer, owed to ChemoCentryx and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of ChemoCentryx, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ChemoCentryx, the absence of good faith on their part, and a reckless disregard for their duties to ChemoCentryx and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to ChemoCentryx.

41.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

42.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, ChemoCentryx has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

46.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

48.    ChemoCentryx is a biopharmaceutical company focused on the development and commercialization of new medications targeting inflammatory disorders, autoimmune diseases, and

cancer. The Company commenced operations in 1997. ChemoCentryx's lead drug candidate is avacopan for the treatment of patients with ANCA vasculitis.

49.    The Relevant Period begins on November 26, 2019. After the market closed on November 25, 2019, the Company issued a press release announcing "Positive Topline Data from Pivotal Phase III ADVOCATE Trial Demonstrating Avocopan's Superiority Over Standard of Car in ANCA-Associated Vasculitis." The press release stated, in pertinent part:

> This global study, in which a total of 331 patients with acute ANCA vasculitis were enrolled, met both of its primary endpoints, disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. Remission was defined as a BVAS score of zero and being off glucocorticoid treatment for ANCA vasculitis for at least the preceding four weeks. The pre-specified primary endpoints were remission of acute vasculitis activity at week 26 and sustained remission at week 52, where avacopan therapy was at least statistically non-inferior to the currently used glucocorticoid-containing standard of care (glucocorticoid SOC). The two primary endpoints were tested sequentially using a gatekeeping procedure to preserve the Type I error.

> *       *       *

> The topline safety results revealed an acceptable safety profile in this serious and life-threatening disease, with fewer subjects having serious adverse events (SAEs) in the avacopan group than in the glucocorticoid SOC control group (42% vs. 45%, respectively). Most reported SAEs were related to underlying ANCA vasculitis disease and commensurate with rates in previously published ANCA vasculitis trials. There were fewer subjects with serious infections in the avacopan group than the glucocorticoid SOC control group. A full analysis of the data is underway and expanded results are expected to be announced in the coming weeks.

50.    In this November 25, 2019 announcement, Defendant Schall stated:

> These results exceed our expectations. Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients. This day we have for the first time demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy; a therapy which the present findings may make obsolete. Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over. Working with our partner VFMCRP, we plan to make regulatory submissions for full marketing approval to both the European Medicines Agency (EMA) and the U.S. Food and Drug Administration (FDA) in 2020.

51.   In its November 25, 2019 release, the Company announced that the data showed "[s]ignificant reduction in glucocorticoid-related toxicity," "significant improvement in kidney function in patients with renal disease," and "improvement in health-related quality of life metrics."

52.   Also on November 25, 2019, the Company held a call with analysts to discuss the results of its ADVOCATED Phase III trial. On the call, Defendant Schall stated "I'll mention as well, safety seems to be very acceptable. The drug was generally very well tolerated with lower incidences of [adverse events] in the ANCA patient population."

53.   On February 19, 2020, the Company issued a press release announcing that Defendant Schall would would present at the 9th Annual SVB Leerink Healthcare Conference on February 26, 2020. In this press release, ChemoCentryx stated: "Avacopan is an orally-administered small molecule that is a selective inhibitor of the complement C5a receptor, or C5aR. In the pivotal Phase III ADVOCATE trial, avacopan demonstrated the ability to induce vasculitis remission at 26 weeks and statistical superiority in sustaining vasculitis remission at 52 weeks. The topline safety results revealed an acceptable safety profile in this serious and life-threatening disease with fewer subjects having serious after events in the avacopan group than in the glucocorticoid-containing standard of care."

54.   The Company issued a press release dated March 3, 2020 containing similar language as that quoted above from ChemoCentryx's February 19, 2020 press release.

55.   On March 10, 2020, ChemoCentryx reported its Fourth Quarter and Full Year 2019 Financial Results. In the press release accompanying this announcement, Defendant Schall stated:

> The power of data to transform the world was evident in the results of our Phase III ADVOCATE trial of avacopan in ANCA-associated vasculitis . . . . The ADVOCATE data marked a critical turning point, in my view, in the treatment of this debilitating disease, with avacopan demonstrating superiority over the current standard of care which employs daily dosing of glucocorticoids. Those results transformed not just thousands of lives potentially, but changed the face of our enterprise as well. We intend to file an NDA for avacopan with the FDA by the middle of this year, and are laying the groundwork for US commercialization. Furthermore, the success of ADVOCATE not only validated the biology of C5a receptor inhibition by avacopan as a powerful therapy but it surpassed expectations and may open doors to additional renal disease opportunities in underserved indications such as lupus nephritis. The momentous readout in ADVOCATE now sets the stage for a data-rich 2020, during which we expect to share topline results from four additional ongoing clinical trials. An epochal year for CCXI was 2019, and we expect 2020 to be extraordinary as well.

56.     The Company's March 10, 2020 press release further stated:

Exceeded expectations for avacopan with topline data from the ADVOCATE Phase III pivotal clinical trial announced in the fourth quarter of 2019, which demonstrated avacopan's statistical superiority in sustaining remission at 52 weeks over the prednisone-containing standard-of-care, eliminating the need for daily noxious steroids. Avacopan was shown to lower all four aspects of the total burden of disease: stopping active vasculitis; significantly lowering current therapy-induced illness, with a statistically significant reduction in the Glucocorticoid Toxicity Index (GTI) and other accepted assessments of glucocorticoid toxicity; significantly improving kidney function as evidenced by a marked improvement in Estimated Glomerular Filtration Rate, or eGFR; and statistically significant improvements in quality of life, assessed by the SF-36 QOL instrument and the EuroQOL-5D-5L instrument (Visual Analogue Scale and EQ Index).

57.     Also on March 10, 2020, the Company held a call with analysts to discuss its financial results. On this call, Defendant Schall stated:

The result of the ADVOCATE trial surpassed all of our expectations and could mark a critical turning point in the treatment of this devastating, debilitating and life-threatening disease. The avacopan value proposition that we tested in the ADVOCATE trial was fourfold, as shown on Slide 5.

One, to stop the acute active vasculitis crisis in ANCA patients by stifling the activation of disease-causing neutrophils. These neutrophils are thought to be driven by the C5a receptor, which is the molecular target of avacopan. Two, by using avacopan instead of chronic daily steroids to eliminate illnesses caused by the current standard daily steroid therapy. Three, to stop the accumulation of organ damage, particularly and notably in the kidney. And four, to improve the all too often miserable quality of life of ANCA patients.

So let me briefly summarize the top line results, which you can find on Slide 6. First, you'll see that avacopan was numerically superior and statistically non-inferior to the daily steroid-containing active comparator at 26 weeks in achieving remission that is in stopping active vasculitis as measured by the Birmingham Vasculitis Activity Score, or BVAS, which was the tool used for the primary efficacy endpoints used in this trial.

After 52 weeks of treatment, the avacopan therapy sustained remission at a rate of 65.7% compared to 54.9% in the active comparator arm. Not only was this numerically and statistically non-inferior to the incumbent standard of care, but this result was highly statistically significant for the superiority of avacopan in terms of sustained remission after 1 year.

Next, avacopan has achieved statistical superiority in reducing the illnesses that are associated with the use of steroids in the active comparator treatment, as compared -- or as measured, rather, by the Glucocorticoid Toxicity Index, a comprehensive quantitative scoring system developed by expert clinicians over the course of some years.

Third, avacopan showed a statistically significant improvement over the active comparator in Estimated Glomerular Filtration Rate, or eGFR. While our goal was originally to stabilize kidney function to save the kidney, it looks as though with avacopan, kidney function actually improves. This perhaps is the single data point that nephrologists are most interested in, and it has been a key factor as we contemplate future opportunities for avacopan, of which I will speak momentarily.

Finally, you can see that avacopan therapy was numerically superior to the active comparator standard of care in all 10 of 10 of the measurements and at each of the time points measured, while showing a statistically significant improvement in 6 of the 10 measurement categories assessed by the SF-36 validated quality of life instrument. Moreover, avacopan was also statistically significantly better in the European index, EuroQOL-5D-5L.

Avacopan thus demonstrated the ability to actually improve the quality of life over 1 year of treatment compared to a deterioration for those in the daily steroid-containing active comparator arm, a remarkable change in how patients perceive and report their health with an instrument validated by regulatory authorities.

Avacopan superiority here includes physical and emotional functioning, including a significant improvement in the crucial category of vitality, which is so important in allowing patients to return to normal lives, with obvious socioeconomic benefits.

The top line safety results revealed an acceptable safety profile in the serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the daily steroid-containing active comparator. Putting this all together, we believe avacopan has a very strong value proposition as it demonstrated progress in all 4 key elements of the total burden of a disease, which leads thousands of lengthy -- two thousands of lengthy hospitalizations each and every year.

58.    On April 6, 2020, the Company filed a proxy statement on Form DEF14A with the SEC (the "2020 Proxy Statement").  The 2020 Proxy Statement represents that the board engages in overall risk management, stating:

**The Board's Role in Risk Oversight**

***Our board of directors has responsibility for the oversight of the company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand the company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic and reputational risk.***

The audit committee reviews information regarding liquidity and operations and oversees our management of financial risks. Periodically, the audit committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. Oversight by the audit committee includes direct communication with our external auditors, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures. The compensation committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking. The nominating and corporate governance committee manages risks associated with the independence of the board, corporate disclosure practices and potential conflicts of interest. *While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire board of directors is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by our board of directors as a whole.*

(Emphasis added). Form DEF14A filed on Apr. 6, 2020, at 8.

59.    In fact, and contrary to the Company's claim in its 2020 Proxy Statement, the Company's Board did not appropriately oversee the Company's risk management process, allowing repeated false and misleading information to be disseminated concerning the Company's ADVOCATE clinical trial.

60.    The Company issued a press release dated May 4, 2020 containing similar language as that quoted above from the Company's February 19, 2020 press release.

61.    On May 11, 2020, the Company held an earnings call to discuss its First Quarter 2020 financial results. On this call, Defendant Schall stated:

Our dialogue with the FDA continues on track, and we are on schedule to file our NDA for avacopan mid this year. Our confidence that we will meet this target was high to start with and has grown with each week that passes. It is a confidence that is founded upon what we consider to be the superlative results achieved in the pivotal Phase III ADVOCATE clinical trial in which avacopan demonstrated statistical superiority in sustained disease remission during 1 year of treatment versus the current steroid-containing standard of care group. This exceeded most expectations since the trial was not powered for superiority. Overall, the ADVOCATE trial revealed a compelling value proposition for avacopan and ANCA in the form of an all-around ability to reduce the total burden of ANCA-related disease.

Notably, beyond bringing the disease symptoms into remission and sustaining people in remission, as mentioned above, in addition, avacopan therapy significantly reduced the illnesses associated with the use of steroids, significantly improved kidney function over 52 weeks and actually improved quality of life, in contrast to the deterioration in quality of life in those patients on the steroid-containing standard of care. Members of the ANCA patient and clinician communities relate that touch effects are unprecedented in the ANCA vasculitis field, bringing the hope for a new paradigm of therapy.

62.    On June 10, 2020, the Company announced plans to commence an underwritten public offering of its common stock. On the same day, the Company filed a Prospectus on Form 424B5 with the SEC. This Prospectus provided, in relevant part:

In November 2019, we announced positive topline data from the pivotal Phase III ADVOCATE trial of avacopan, our lead drug candidate that is an orally-administered selective complement 5a receptor inhibitor, for the treatment of patients with anti-neutrophil cytoplasmic antibody-associated vasculitis, or ANCA vasculitis. The ADVOCATE trial compared avacopan with the currently used standard of care regimen which consists of high doses of glucocorticoid (most commonly prednisone) which is administered to patients for months. The prednisone standard of care was the active comparator (prednisone active comparator standard of care, or SOC) against which avacopan was assessed in the a two-armed, randomized, controlled, and blinded trial. Subjects in both study arms received background therapy with rituximab or cyclophosphamide. The trial met both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group, where BVAS remission was achieved in 72.3% of the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group ($p<0.0001$ for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, achieving both non-inferiority and superiority to prednisone active comparator SOC ($p=0.0066$ for superiority of avacopan). Reduction in overall burden of disease management and improvement in quality of life was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone.

We plan to file a New Drug Application, or NDA, with the U.S. Food and Drug Administration, or FDA, in mid-2020 and, if the NDA is approved, to commercialize avacopan in the United States on our own and internationally through our kidney health alliance with Vifor Fresenius Medical Care Renal Pharma Ltd. and its affiliates and sublicensees, or collectively, Vifor. We are also developing avacopan in other indications, including complement 3 glomerulopathy, or C3G, and hidradenitis suppurativa, or HS.

*Avacopan (CCX168)—Inhibition of Complement-Mediated Pathways in Orphan Diseases*

Avacopan (formerly CCX168) is our lead drug candidate. It is a potential first-in-class, orally-administered molecule that employs a novel, highly targeted mode of action in the treatment of ANCA vasculitis and other complement-driven autoimmune and inflammatory diseases. ANCA vasculitis is an orphan, severe, and often fatal autoimmune disease that is characterized by elevated levels of autoantibodies called anti-neutrophil cytoplasmic autoantibodies and by inflammation that can affect many

different organ systems, and commonly involves the kidneys. ANCA vasculitis affects approximately 40,000 to 75,000 people in the United States, with between 4,000-9,000 new cases each year; similarly, ANCA vasculitis affects approximately 50,000 to 100,000 people in Europe, with between 5,000-10,000 new cases each year.

We have successfully completed and reported positive topline clinical data from our pivotal Phase III clinical trial of avacopan for the treatment of ANCA vasculitis, known as the ADVOCATE trial. ADVOCATE was a randomized, double-blind, active-controlled worldwide clinical trial which enrolled 331 patients with newly diagnosed or relapsing ANCA vasculitis at approximately 200 sites in the United States, Canada, Europe, Australia, New Zealand and Japan. The aim of the trial was to assess the safety and efficacy of avacopan in inducing and sustaining remission in patients with ANCA vasculitis.

63.   On June 15, 2020, ChemoCentryx announced that its public offering of 5.2 million shares of its common stock had closed, and that the underwriters thereof exercised in full their option to purchase an additional 780,000 shares. All shares were sold by ChemoCentryx at the price of $58.00 each. Net proceeds to ChemoCentryx, after deducting underwriting discounts, commissions, and estimated offering costs, were $325.4 million.

64.   On July 9, 2020, ChemoCentryx announced that it had submitted its New Drug Application to the FDA for avacopan in ANCA-associated vasculitis. In this announcement, ChemoCentryx stated:

> The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

65.   In addition, Defendant Schall stated:

> We have achieved a major landmark for ChemoCentryx with the submission of the NDA for avacopan in ANCA-associated vasculitis following our highly successful Phase III ADVOCATE trial . . . . There is an urgent need for a non-immunosuppressive, targeted therapy that can achieve and sustain remission in this organ- and life-threatening disease, while reducing the toxicities associated with daily steroid use. Submission of our NDA is a critical step toward addressing this unmet need, as we seek to improve patients' lives.

66.   On August 10, 2020, the Company issued a press release announcing its Second Quarter 2020 financial results. In the "Key Highlights" lauded in the release, the Company included that it had:

Filed the New Drug Application (NDA) for avacopan in the treatment of ANCA-associated vasculitis in July. The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

67.   Also on August 10, 2020, ChemoCentryx held a call with analysts to discuss its financial results. On this call, Defendant Schall stated that "[f]rom ADVOCATE, there was good news here, too. A statistically significant improvement in clinically validated measurements of quality of life on avacopan therapy. And overall, avacopan also demonstrated a favorable safety result in this serious and life-threatening disease with fewer subjects having fewer numbers of serious adverse events in the avacopan group than in the steroid standard of care group."

68.   Defendant Schall further stated on this same call:

In the ANCA patient population, they're on background therapy for their disease. They're on also an amazing number, typically an amazing number of concomitant medications to control other complications of the therapy, prophylaxis for Pneumocystis jirovecii as a consequence of being under high doses of glucocorticoids and/or cyclophosphamide and rituximab. So that has its own problem, that conmed. They're trying to control their incipient diabetes and some of the bone problems with conmeds. They're really, really a challenged patient population. And one hopes going back to avacopan in ANCA vasculitis, by removing some of the need for these broadly immunosuppressive therapies, we also get rid of some of these nasty conmeds that give them so many AEs and SAEs.

But even there in ANCA, we could show 40% fewer number of severe AEs in the avacopan group versus the prednisone standard of care group. So there is, seems to be, at many levels, very good safety advantages to using avacopan. But again, we'll let regulators and other sift through the data sets, and I won't say any more about that since it's under a filing right now. But it is pretty clear to us that HS population is, by and large, notwithstanding the fact that they have this really debilitating illness, and that causes them a lot of discomfort and pain in many areas of life physically and emotionally, they are, by and large, not under the burden of quite so many concomitant medications. And the safety database, although still blinded, the suggestion is that we have far fewer, across

the board, safety events just in this patient population, full stop. And again, even in the blinded data set, nothing that seems out of the ordinary for this patient population.

So I think when the data come out, it will certainly add to and fundamentally enhance the picture of safety around avacopan, which we believe, based on evidence to date, both preclinical, off clinical, number of species and humans, both healthy and with ANCA vasculitis population, we believe will be a very supportive data package on safety as well. So we hope it will just further enhance that package. And if there are any outstanding questions that come out of ANCA vasculitis, which in a complex patient population, there always could be, but if there are any, we've got an equally large data set in hidradenitis suppurativa to check whether or not any of those kind of events are evident in HS. So I think it's going to be a real benefit to our overall packaging profile.

69.    On September 17, 2020, the Company announced that the FDA had accepted the avacopan NDA for the treatment of ANCA-associated vasculitis, setting a Prescription Drug User Fee Act ("PDUFA") goal data of July 7, 2021.[4] This release provided, in relevant part:

The NDA included data from the global, Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results, with fewer patients having serious adverse events in the avacopan group than in the prednisone group.

70.    On November 9, 2020, the Company held an earnings call to discuss its Third Quarter 2020 financial results. On this call, Defendant Schall stated:

Turning now to avacopan in the treatment of ANCA-associated vasculitis. As summarized in Slide 12, in Q3, we hit an historic milestone when the FDA notified us in September of their acceptance for review of our new drug application. The FDA set a PDUFA date goal of July 7, 2021. As for the question of an advisory committee, we intend to provide an update following the mid-cycle review meeting of the FDA, and we are preparing for one, nevertheless. The FDA's acceptance for review was followed by the announcement, just last week, of the European authorization application for avacopan in ANCA vasculitis, with a decision expected in the second half of 2021.

As many of you know, the cornerstone of our submission to the regulatory agencies has been the data from the pivotal Phase III ADVOCATE clinical trial, which demonstrated statistical superiority of the avacopan group and sustaining remission at 52 weeks compared to the prednisone group. The results of the ADVOCATE study were presented last month in an oral abstract session during the American Society of Nephrology's Kidney Week 2020 Reimagined Meeting. They were presented by the renowned nephrologist, David Jayne, MD, Professor of Clinical Autoimmunity at the University of

Cambridge in England. Dr. Jayne's presentation highlighted the potential of avacopan to offer new hope to patients who suffer from this incurable orphan disease. And just this last Friday, no less an expert than Professor Peter Merkel, MD, the Chief of Rheumatology at the University of Pennsylvania, gave a plenary session at -- on the ADVOCATE results at the American College of Rheumatology Convergence 2020 Meeting.

Professor Merkel delved into many important aspects of the avacopan data set, including highlighting some important features at both weeks 26 and weeks 52 in the trial result. As Dr. Merkel put it, and I'm alluding now to slide -- the next slide in the deck that you can see with the week 26 and 52 data. As Dr. Merkel put it, there are some intriguing findings to explore in the subgroups. Patients who had relapsing disease had even better benefit from avacopan at 26 and week 52. However, this should not imply that patients with newly diagnosed disease did not benefit from avacopan, because while remission rates with avacopan in newly diagnosed were about the same as the Prednisone group, remember, the patients receiving avacopan achieved this benefit without receiving daily glucocorticoids and their negative consequences. Similarly, said Professor Merkel, there were findings that patients who were MPO-positive received extra benefit and the patients who received rituximab as background therapy, seemed to receive extra benefit as well.

71.    On this same call, an analyst asked Defendant Schall "Did the FDA indicate any review issues? And is there any update around the agency's view around AdCom?" Defendant Schall responded:

All of our interactions with the agency so far, again, without going into any real detail because we are under review. But to my mind, have been straightforward and expected. And I think we have ready access and have had ready access to all the answers so far for the queries. So I have not seen personally anything unusual or anything that, again, we did not fundamentally anticipate and for which we've been, quite frankly, ready. So I think it's going forward in a very reasonable, straightforward, logical way. And again, I won't say anything more than that because I'm sensitive to making sure we're not talking too much about a file under review.

AdCom, we expect to know something more definite after the FDA's mid-cycle meeting. And I think probably the public calendars will tell you what that is. As soon as we know, we will let the community know. We have always, even before we filed the NDA, been presuming and preparing for an AdCom. Why is that? Number one, this is a new medical entity. It's not been reviewed or approved for any other indication, already kind of putting you into the presumptive AdCom bucket, at least in my view, historically. Second, we're dealing with an orphan indication in ANCA vasculitis. And frankly, the agency has only truly reviewed an ANCA registration package but once before. And that was when rituximab, given in combination with the daily glucocorticoids was offered as an alternative to cyclophosphamide given in combination with daily glucocorticoids. And that was some time ago. So it's not as if it's a garden-variety indication where it's

formulaic in terms of how to review an application. So again, oftentimes, that will trigger an AdCom.

72.    On the same earnings call, Defendant Schall further stated:

Well, I hate to even presume to think about what the agency might think or say and certainly don't want to think -- to discuss any discussions with them until those are all done. But let me put it this way. Look, fundamentally, this is the longest randomized trial ever done in ANCA vasculitis, right? The randomized blinded trial, 52 weeks, continuous dosing and following. Look, that's not been done before. So we've got the biggest data set by 6 months. That's important because it informs a lot of discussions. So without thinking yet about what the agency may or may not say, they'll look at the data in their own way, obviously, but the data kind of speak for themselves. But I will tell you this, it sounds like we're already informing new discussions in the physician community, because the fact of the matter is, if you have, a, evidence that the hardest people to treat, the anti-MPO relapsers are pretty -- are notoriously difficult to treat. The MPA diagnosis, which goes along more or less with MPO-positivity, really difficult to get a handle on, especially with relapsers.

But fundamentally, I think the more subtle and for me, the more profound point is that, my goodness, when you look at the fact that avacopan not only had a really just a general improvement in relapse risk -- reducing relapse risk by some 54% and those were 2 charts shown in these meetings as Kaplan-Meier graphs where avacopan was clearly advantageous in the population. And part of that comes from that really interesting advantage that avacopan has with -- when given with rituximab as background therapy versus daily prednisone with rituximab as background therapy. 71% still in remission at week 52 versus 56% with the prednisone group. The important point here is we ran this trial according to rituximab's label at the time. And it was fully enrolled under the old rituximab label, which was you don't give rituximab except for that first course of therapy, that's 4 weekly infusions, spaced by a week. So they get up to 4 weeks. You don't top them up after that under the original label.

This data, some people have criticized us for that, like we had a choice to begin with, which we didn't. But in fact, the more enlightened discussions that I've heard, especially recently are no, the data actually show you don't need to keep immunosuppressing people with rituximab. That's a large end, 107 people per group were following. So they didn't get ritux -- they're totally matched except for prednisone versus avacopan. They didn't get any additional rituximab. So avacopan was kind of monotherapy, right? They didn't get any azathioprine or anything else after the ritux. And people are really, really markedly in remission at the end of 52 weeks. So that's an important discussion to have. So I don't know how that will play out. And again, I don't want to make too much or too little of that observation, but I think it's compelling, and I think it's starting to inform some new discussions.

73.    On February 17, 2021, ChemoCentryx issued a press release announcing that the "Results of the Pivotal Phase III ADVOCATE Trial of Avacopan for the Treatment of ANCA-Associated

Vasculitis" would be published in *The New England Journal of Medicine*. This release provided, in relevant part:

> ANCA-associated vasculitis is a systemic auto-immune disease in which over-activation of the complement system further activates neutrophils, leading to inflammation and eventual destruction of small blood vessels. This results in organ damage and failure, with the kidney as the major target, and is fatal if not treated.

> "The results of the ADVOCATE trial are transformational and demonstrate the potential of avacopan to offer a substantial change in the treatment paradigm for ANCA-associated vasculitis," said Peter A. Merkel, M.D., MPH, Chief of Rheumatology and Professor of Medicine and Epidemiology at the University of Pennsylvania. "Current treatment for ANCA-associated vasculitis consists of combining months of daily glucocorticoids ("steroids" such as prednisone) with other immunosuppressive medications. Use of prednisone is associated with significant side-effects, including infections, diabetes mellitus, weight gain, and other problems. The ability of avacopan to replace prednisone and help patients achieve sustained remission is a significant and exciting advance for the treatment of patients with ANCA-associated vasculitis."

> "The ADVOCATE trial clearly demonstrates avacopan's ability to improve kidney function, measured by eGFR, in ANCA-associated vasculitis, and was recently reinforced in another orphan kidney disease, C3 Glomerulopathy. This is a significant advantage over other treatment options that often come with added toxicities and will likely lead to reduced risk of kidney failure over the longer term," said David Jayne, M.D., Director of the Vasculitis and Lupus Service, Addenbrooke's Hospital in Cambridge.

> The ADVOCATE trial was a global, randomized, double-blind, active-controlled, double-dummy Phase III trial in 331 patients with ANCA-associated vasculitis in 20 countries. Eligible patients were randomized to receive either avacopan or oral prednisone. In addition, all patients received standard background therapy of either: (a) rituximab for 4 weeks; or (b) cyclophosphamide for 13 weeks followed by azathioprine/mycophenolate, evenly balanced between the avacopan and prednisone groups.

> The study met both of its primary endpoints, demonstrating disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score (BVAS). Specifically, BVAS remission at week 26 was achieved in 72.3% of the avacopan treated patients vs. 70.1% of subjects in the prednisone group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone group, achieving both non-inferiority and superiority to the prednisone group (p=0.007 for superiority of avacopan).

> Additionally, results published in the NEJM also show that, compared to the prednisone group, avacopan treatment:

• Reduced the risk of vasculitis relapse by 54%; there was a 10.1% relapse rate in the avacopan group compared to 21.0% in the prednisone group.

• Demonstrated greater improvement in kidney function, with a mean increase from baseline to week 52 in estimated glomerular filtration rate (eGFR) of 7.3 mL/min/1.73 m2 with avacopan therapy vs. an increase in eGFR of 4.1 mL/min/1.73 m2 in the prednisone group, and the difference between groups was 3.2 mL/min/1.73 m2 (95% CI, 0.3 to 6.1).

• Significantly lowered glucocorticoid toxicity, with avacopan therapy 39.7 vs. 56.6 in the prednisone group in the Glucocorticoid Toxicity Index (GTI) Cumulative Worsening Score with a difference between groups of −16.8 points (95% CI, −25.6 to −8.0), and 11.2 with avacopan therapy vs. 23.4 for the prednisone group in the GTI Aggregate Improvement Score, with a difference between groups of −12.1 points (95% CI, −21.1 to −3.2).

• Led to greater improvement in health-related quality of life, measured by the Short Form 36 (SF-36) version 2 and the EuroQOL-5D-5L instrument (both Visual Analogue Scale and EQ Index), compared to the prednisone group.

Avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

The U.S. Food and Drug Administration (FDA) is evaluating avacopan for the treatment of ANCA-associated vasculitis and has set a Prescription Drug User Fee Act (PDUFA) target goal date of July 7, 2021.

74.    On March 1, 2021, the Company reported its Fourth Quarter and Full Year 2020 Financial Results. On the same day, the Company issued a press release announcing the results. In the release, Defendant Schall stated, in pertinent part:

Inexorably our march of progress advances, drummed on by the call to improve the lives of patients enduring diseases with grossly inadequate treatments . . . . With regulatory applications for avacopan in ANCA-associated vasculitis accepted for review on three continents, we are preparing for our first commercial launch. In my view, avacopan has the potential to transform the lives of patients suffering from debilitating and intractable diseases, as demonstrated by the results not just in ANCA-associated vasculitis but also from our clinical trials in HS and C3G. We plan to launch a Phase III trial of avacopan in patients with severe HS in 2021, and to discuss the regulatory pathway for avacopan in C3G. Meanwhile, we are on track to initiate our next cycle of clinical development in 2021, with avacopan in lupus nephritis and – breaking entirely new ground - our orally-administered small molecule checkpoint inhibitor CCX559, designed to be a next generation cancer treatment. We sense at ChemoCentryx the opportunity to transform the therapeutic landscape to the benefit of patients – and we intend to seize it.

75.    On April 7, 2021, the Company filed a proxy statement on Form DEF14A with the SEC (the "2021 Proxy Statement").  The 2021 Proxy Statement represents that the board engages in overall risk management, stating:

**The Board's Role in Risk Oversight**

***Our board of directors has responsibility for the oversight of the company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand the company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic and reputational risk.***

The audit committee reviews information regarding liquidity and operations and oversees our management of financial risks. Periodically, the audit committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. Oversight by the audit committee includes direct communication with our external auditors, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures. The compensation committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking. The nominating and corporate governance committee manages risks associated with the independence of the board, corporate disclosure practices and potential conflicts of interest. ***While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire board of directors is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by our board of directors as a whole.***

Form DEF14A filed on Apr. 6, 2020, at 8.

76.    In fact, and contrary to the Company's claim in its 2021 Proxy Statement, the Company's Board did not appropriately oversee the Company's risk management process, allowing repeated false and misleading information to be disseminated concerning the Company's ADVOCATE clinical trial.

77.    On April 29, 2021, just five days before the release of the FDA's Briefing Document, described in greater detail below, the Company issued a press release reporting its First Quarter 2021 financial results with recent highlights. In the release, Defendant Schall stated, in pertinent part:

Momentum builds with each passing quarter, bringing us closer to our goal of bringing novel, precisely targeted medicine to those that need it most . . . . At our R&D Day earlier this month, two world-renowned clinicians outlined the unmet needs in ANCA-associated vasculitis and the data driving their conviction that avacopan could become a

landscape-changing therapy. We are well prepared and look forward to providing our views at the FDA Advisory Committee meeting on this topic in just a few days. During our R&D Day we also took the opportunity to establish how our novel small molecule PD-1/PD-L1 inhibitor CCX559 could transcend current limitations in the treatment of cancer. Meanwhile we are progressing toward our next cycle of clinical trials: a Phase III trial of avacopan in patients with severe HS; the initiation of clinical development of avacopan in lupus nephritis, and our first in human studies of the novel orally administered checkpoint inhibitor CCX559 in cancer patients. We look forward to an historic year of 2021 at ChemoCentryx, and we will devote all our energies to making the dream of breakthrough new therapies a reality for patients.

78.    Also on April 29, 2021, the Company held a call with analysts to discuss its First Quarter 2021 financial results. On the call, Defendant Schall stated:

I think there's a lot of misconceptions about what is current "standard of care" there and there are some facts that have changed since we started the trial. But let me put it -- let me be very clear. We tried to make the ADVOCATE trial as close to real-world practice as possible. I -- that includes steroid regimen and tapering, both then best practice and, in fact, that's now best practice. We tried to make the background medication of either cyclophosphamide or rituximab as close to real-world practice. And in fact, we were completely aligning ourselves with the label of all those medications at the time, including rituximab.

So what we got was an excellent trial design that reflected then real word practice. And still, to a large extent now, the one thing that has changed is rituximab label was expanded towards the very end of the ADVOCATE trial by the way to allow for increased frequency of dosing. So before it was essentially one regimen at the start of the treatment phase, which is 4 infusions spaced by 1 week. And now you can top up according to the label as frequently as every 6 months or so.

Now while that is becoming an emerging paradigm, especially for patients that have a history of ANCA-associated vasculitis with relapse, the latest figures I saw, by the way, for newly diagnosed disease, I don't know if that's yet been adopted as the majority paradigm. So I think while rituximab's label has expanded fairly recently, I'm not sure I would call it exactly a changed standard of care. But it is a very fair point to say, "Well, look, rituximab is used ever more frequently." All the better the features of the ADVOCATE trial actually allow us to leapfrog to what I think is the gold standard, which would be better for a maintenance therapy once people are quiescent. How would you do that trial? You do a double-blind, randomized placebo-controlled trial.

And as I referred to in my remarks, de facto, you can get some of that information from weeks 26 to 52 in the ADVOCATE trial from the 65% of the people in that trial who had avacopan plus rituximab as a start and then went on to have no further medication as the trial were on. So they didn't get tapped up with rituximab. What did we see? We saw about a 71% sustained remission in the avacopan group versus a 50 -- middle 50% remission in the prednisone group. And this is the rituximab's staff alone. And it's not a tiny number of people. It's 200-plus people. So it's bigger than the whole RAVE trial.

So what that tells us is that we have a very good way of maintaining remission after people get to a quiescent state at that first 26 weeks, and there isn't a need to give them necessarily more rituximab. And rituximab is not without its consequences. So it's at least an observation. Is it a trial designed to answer that question? No. But it is a feature of this trial that does shed light on that question. Could avacopan be used as a monotherapy in a maintenance surgery? And the answer is, well, these data suggest that it could., And that's what Dr. Merkel and Dr. Jayne alluded to in their remarks at both international congresses and Dr. Jayne at the R&D Day.

So I think that's how best I would answer the question. We did an excellent trial. We reflect standard real-world practices at the time and still. And the fact that we didn't add additional rituximab actually gives a feature to our trial, which I think is very valuable. Finally, again, rituximab is a changing landscape. It's not used routinely, I think, even at this point, for newly diagnosed people in the second 6 months. It's mostly reserved for people with the history of relapse. So that's -- I think that's what I would put to the community at this point. It's again a set of observations based on data.

79.    Importantly, in this April 29, 2021 call, Defendant Schall acknowledged that the Company had "now received the FDA's briefing book for the Advisory Committee."

80.    The above statements were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) the study design of the Phase III ADVOCATE trial presented issues about the interpretability of the trial data to define a clinically meaningful benefit of avacopan and its role in the management of ANCA-associated vasculitis; (2) the data from the Phase III ADVOCATE trial raised serious safety concerns for avacopan; (3) these issues presented a substantial concern regarding the viability of ChemoCentryx's NDA for avacopan for the treatment of ANCA-associated vasculitis; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

81.    On May 4, 2021, in advance of the AdCom scheduled for May 6, 2021, the FDA released the Briefing Document concerning ChemoCentryx's NDA #214487 for avacopan. In this Briefing Document, the FDA noted that ChemoCentryx had "submitted the results of a single phase 3 study, CL010_168, and two phase 2 studies, CL002_168 and CL003_168. The focus of the AAC discussion will be data from Study CL010_168, also referred to as ADVOCATE, that compared avacopan to standard of care . . . in patients with AAV; patients in both arms received a background of either

rituximab or cyclophosphamide standard induction regimen." The FDA continued in the Briefing Document: "*[c]omplexities of the study design, as detailed in the briefing document, raise questions about the interpretability of the data to define a clinically meaningful benefit of avacopan and its role in the management of AAV*." (Emphasis added).

82.    The FDA Briefing Document continued: "[a]lthough primary efficacy comparisons were statistically significant, *the review team has identified several areas of concern, raising uncertainties about the interpretability of these data and the clinical meaningfulness of these results* . . . ." (Emphasis added). These concerns included:

(1) At Week 26, the proportion of patients in disease remission in the avacopan group (72.3%) was non-inferior to the prednisone group (70.1%) according to the Applicant's testing plan. However, superiority was not met. *In pre-submission communications, FDA stated that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids as it would be difficult to establish whether avacopan is effective or whether rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms. In addition, the Agency expressed concerns about the ability to adequately justify an acceptable non-inferiority margin, given that there were no historical trials appropriate to estimate the contribution of glucocorticoids to the treatment effect of glucocorticoids and cyclophosphamide or rituximab in the control arm.* As discussed below, the justification for the non-inferiority (NI) margin was based on studies of different types of vasculitides, with different concomitant therapies, and of various designs that would not be considered appropriate to inform a NI margin for the study.

(2) Interpretation of the non-inferiority at Week 26 is further limited by the large number of patients in the avacopan arm (86%) who received non-study supplied glucocorticoids from Week 0 to 26. While the mean cumulative glucocorticoid dose per patient over Week 0 to 26 was lower (1072.9 mg) in the avacopan-treated patients compared to the mean cumulative dose in the prednisone-treated patients (3192.5 mg), the non-inferiority assessment is not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids. At this time, it is not clear how much reduction in glucocorticoids would be considered clinically meaningful and if the protocol-specified higher dose of glucocorticoids is required for control of disease activity. Therefore, the interpretability and meaningfulness of this comparison is challenging. This issue is further discussed below under Glucocorticoid Use.

(3) The clinical pharmacology program has identified avacopan as a CYP3A4 inhibitor that has the potential to increase exposures to systemic glucocorticoids which are CYP3A4 substrates, raising further uncertainties about the true difference in glucocorticoid exposures and its impact on the non-inferiority comparisons between the two groups at Week 26, and respectively the proposed role of avacopan as a steroid-sparing agent, as glucocorticoid exposures were not assessed in Study CL010_168.

(4) At Week 52, there was a disparity in observed treatment effects between the subgroups that received rituximab and cyclophosphamide (IV and oral) induction treatment. The estimated risk difference for disease remission at Week 52 was 15.0% (95% CI: [2.2%, 27.7%]) in the subgroup receiving induction with rituximab and 3.3% (95% CI: [-14.8%, 21.4%]) in the cyclophosphamide plus maintenance azathioprine subgroup (Table 10). ***Based on the data, there is no evidence of clinically meaningful treatment effect in the cyclophosphamide induction subgroup.*** Further, the treatment comparison in the complementary rituximab induction subgroup may not be considered meaningful because these patients did not receive maintenance therapy, i.e., due to undertreating of patients, the effect observed in the rituximab subgroup may not represent a clinically meaningful treatment effect compared to standard of care. Thus, the observed superiority at Week 52 may be a result of the treatment difference in the subgroup receiving induction with rituximab. We note that, at the time the study was designed, repeat dosing with rituximab was not established as maintenance therapy; however, long-term immunosuppression had been demonstrated to reduce disease relapse and was standard-of-care. The result of the subgroup analysis suggests the possibility that avacopan was efficacious only in the population who did not receive standard-of-care maintenance immunosuppression therapy and may be considered undertreated, raising questions about the adequacy of the comparisons and clinical meaningfulness of the avacopan effect at Week 52.

(5) ***There were differences between the assessments performed by the Investigator and the Adjudication Committee, most frequently related to the attribution of persistent vasculitis which was not captured in the modified BVAS administered in the study.*** Discrepancies between the Investigator and Adjudication Committee occurred in 17 patients at Week 52. Statistical analyses of the primary endpoint using the Investigator assessment of BVAS remission resulted in more conservative estimates of treatment effect, e.g., statistical significance for superiority would no longer be demonstrated with these scores. ***While the pre-specified analysis used the Adjudicator assessments, the assessment based on the Investigators, experienced in management of vasculitis, may better reflect real-world use.***

(Emphasis added).

83.    In addition, the FDA raised serious concerns over the safety of avacopan. In the Briefing Document, the FDA noted:

Deaths were rare, 2 in the avacopan arm and 4 in the control arm. Treatment-emergent infections, serious infections, and opportunistic infections were similar or fewer in the avacopan group. . . . One avacopan-treated patient had life-threatening hepatitis B reactivation during the follow-up period after rituximab treatment. A greater proportion of avacopan-treated patients had [adverse events] associated with hepatic abnormalities . . . including hepatobiliary disorders . . . . The proportion of patients with [adverse events] and [severe adverse events] within the hepatobiliary system organ class were also greater in the avacopan group . . . as compared to the prednisone group . . . . One patient had an [severe adverse event] of hepatocellular injury with increase in liver enzymes upon rechallenge with avacopan. One patient had an SAE of hepatic function abnormal

1
2
3
4
5
6
7
8

with improvement in liver enzymes after discontinuation of avacopan; this patient was also found to have a positive hepatitis B DNA assay was treated with entecavir and did not resume avacopan. The Investigator assessed the event as possibly related to avacopan, but attribution of the event is confounded by the subsequent diagnosis of hepatitis B. One patient had an [severe adverse event] of severe hepatic function abnormal and met Hy's Law laboratory criteria with a liver biopsy that was suggestive of drug-induced hepatitis; however, this patient also received multiple other drugs associated with liver enzyme elevations. [Adverse events] associated with hepatic abnormalities led to drug discontinuation in 7 patients in the avacopan arm and 2 patients in the prednisone arm. In addition, there were 2 patients with angioedema (1 serious) in the avacopan group, compared to none in the prednisone group. ***Given the small safety database, conclusions are limited, however, imbalances in hepatotoxicity, liver enzyme elevations, and angioedema are observed despite the small sample size.***

9

(Emphasis added).

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

84.    In the "Benefit-Risk Considerations" section of the Briefing Document, the FDA noted that "AAV is a rare and serious disease associated with high morbidity and mortality. It is also a disease with high unmet need for new therapies. Given these considerations, in principle, a single adequate and well-controlled (AWC) study may be considered to establish substantial evidence of efficacy." The FDA continued, "***[h]owever, in CL010_168, there are substantial uncertainties around the Phas3 study design and results, raising questions about the adequacy of this single trial to inform the benefit-risk assessment***." (Emphasis added). Among other concerns it raised in this section, the FDA wrote that "the Applicant has not provided adequate data or information that would isolate the effect of prednisone to inform the margin of the non-inferiority comparison in this study," "the interpretation of the non-inferiority assessment is challenging," and "data from the clinical pharmacology program has identified avacopan as a CYP3A4 inhibitor that has the potential to increase exposures to systemic glucocorticoids which are CYP3A4 substrates, raising further questions about the true difference in glucocorticoid exposures and its impact on the non-inferiority comparisons between the two groups, and respectively the proposed role of avacopan as a steroid-sparing agent." The FDA further noted that although "statistical significance was observed for both non-inferiority and superiority at Week 52 for the primary endpoint, it is not clear if the comparisons between and prednisone arm beyond Week 26 are meaningful. Superiority of the avacopan arm over the prednisone arm was not achieved for remission at Week 26."

27
28

85.    Analysts were stunned by the news and concerns raised by the FDA in the Briefing Document. For example, Piper Sandler commented that the Briefing Document raised "serious

questions" about the Phase 3 ADVOCATE trial design and the analysis of avacopan's effect in treating ANCA-associated vasculitis. Similarly, JPMorgan called the Briefing Document "worse than expected," adding that the "negative tone/stance of the FDA documents is without a doubt concerning."

86.   On this news, the price of ChemoCentryx common stock plummeted over 45% in one day, down from its May 3, 2021 closing price of $48.82 to a May 4, 2021 close of $26.63 per share, on unusually high trading volume. Shares traded intraday as low as $17.79 each. This represents a one-day loss of approximately $1.5 billion in market capitalization.

87.   The above statements were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) the study design of the Phase III ADVOCATE trial presented issues about the interpretability of the trial data to define a clinically meaningful benefit of avacopan and its role in the management of ANCA-associated vasculitis; (2) the data from the Phase III ADVOCATE trial raised serious safety concerns for avacopan; (3) these issues presented a substantial concern regarding the viability of ChemoCentryx's NDA for avacopan for the treatment of ANCA-associated vasculitis; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

88.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of ChemoCentryx's common stock, Plaintiff and the Company have suffered significant losses and damages.

## DAMAGES TO THE COMPANY

89.   ChemoCentryx has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, ChemoCentryx has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b.   substantial loss of market capital;

c.   costs already incurred and to be incurred defending the Securities Class Action;

d.   the costs of incentive bonuses paid to Defendants that are the subject of the misstatements described herein;

e.   any fines or other liability resulting from the Company's violations of federal law.

90.   In addition, ChemoCentryx's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

91.   The wrongdoing complained of herein has irreparably damaged ChemoCentryx's corporate image and goodwill.  For at least the foreseeable future, ChemoCentryx will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ChemoCentryx's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.   Plaintiff brings this action derivatively in the right and for the benefit of ChemoCentryx to redress injuries suffered, and to be suffered, by ChemoCentryx as a direct result of violations of federal securities laws by the Defendants.  ChemoCentryx is named as a nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.   The Board of ChemoCentryx, at the time this action was commenced, consisted of the following eight individuals: Thomas J. Schall, Thomas A. Edwards, Joseph M. Feczko, Rita I. Jain, Susan M. Kanaya, Henry A. McKinnell, Jr., Geoffrey M. Parker, and James L. Tyree.

94.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the ChemoCentryx Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Schall Because His
### Principal Professional Occupation is as the Company's Chairman and CEO

95.   Defendant Schall has been the Company's President and Chief Executive Officer ("CEO") since 1997 and Chairman of the Board of Directors since April 2021. In his role as CEO of the Company

for fiscal years 2019 and 2020, Defendant Schall received $3,341,856 and $8,366,309 in total compensation, respectively.

96.    The Company does not claim that Defendant Schall is an independent director and because Defendant Schall's primary source of income and primary employment is his employment as Chairman and CEO of ChemoCentryx and his professional reputation is inextricably bound to his role at ChemoCentryx, Defendant Schall is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendant Jain**

97.    Defendant Jain has been the Company's Executive Vice President and Chief Medical Officer since October 2021, and a member of the Company's Board since March 2019. In her role as a member of the Company's Board for fiscal years 2019 and 2020, Defendant Jain received $434,846 and $478,112 in total compensation, respectively.

98.    The Company does not claim that Defendant Jain is an independent director and because Defendant Jain primary source of income and primary employment is her employment as Executive Vice President and Chief Medical Officer of ChemoCentryx and her professional reputation is inextricably bound to her role at ChemoCentryx, Defendant Jain is incapable of acting independently and demand is futile upon her.

**Demand is Futile as to Defendant Kanaya**

99.    Defendant Kanaya has been the Company's Executive Vice President and Chief Financial and Administrative Officer since October 2016, and a member of the Company's Board since March 2021. Prior to that, Defendant Kanaya served as the Company's Senior Vice President, Finance, and Chief Financial Officer from January 2006 to October 2016. In her role as Chief Financial and Administrative Officer of the Company for fiscal years 2019 and 2020, Defendant Kanaya received $1,584,365 and $2,920,432 in total compensation, respectively.

100.    The Company does not claim that Defendant Kanaya is an independent director and because Defendant Kanaya primary source of income and primary employment is her employment as Executive Vice President and Chief Financial and Administrative Officer of ChemoCentryx and her professional reputation is inextricably bound to her role at ChemoCentryx, Defendant Kanaya is incapable of acting independently and demand is futile upon her.

**Demand is Futile as to the Members of the Audit Committee**

101.    Demand is futile as to Defendants McKinnell, Tyree, Edwards, Feczko, Jain, and Parker as members of the Audit Committee (the "Audit Committee Defendants") for their knowing failure to fulfill their responsibilities.

102.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The Audit Committee Charter notes that the purpose of the Audit Committee shall be to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company on behalf of the Board and to report the results of its activities to the Board."

103.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

104.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

105.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

106.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial

prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

107.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.   By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

108.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## **Additional Reason for Demand Futility**

109.    ChemoCentryx's officers and directors are protected against personal liability for their acts of mismanagement and violations of federal securities law alleged herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ChemoCentryx.   Upon information and belief, however, there have been certain changes in the language of directors' and officers' liability insurance policies in the past few years and the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by ChemoCentryx against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."   As a result, if these directors were to sue themselves or certain of the officers of ChemoCentryx, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.   On the other hand, such insurance coverage exists for this action, which is brought derivatively, and will provide a basis for the Company to effectuate a recovery.   Thus, demand on the Director Defendants is futile, and therefore, excused.

**COUNT I**

**Against the Individual Defendants for Contribution Under Section 10(b) of the Exchange Act,**

**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

110.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.  As a result of the conduct and events alleged above, ChemoCentryx has been named as a defendant in the Securities Class Action brought on behalf of ChemoCentryx shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

112.  Federal law provides ChemoCentryx with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, ChemoCentryx has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling ChemoCentryx to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

113.  Accordingly, Plaintiff, on behalf of ChemoCentryx, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with ChemoCentryx under Rule 10b-5, or if joined in such actions, would be liable for the same damages as ChemoCentryx.

114.  ChemoCentryx claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Individual Defendants**

115.  Throughout the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's Phase III ADVOCATE trial.  These statements were materially misleading to persons who purchased ChemoCentryx securities during the Relevant Period. Specifically,

Defendants misrepresented and/or failed to disclose to investors that: (1) the study design of the Phase III ADVOCATE trial presented issues about the interpretability of the trial data to define a clinically meaningful benefit of avacopan and its role in the management of ANCA-associated vasculitis; (2) the data from the Phase III ADVOCATE trial raised serious safety concerns for avacopan; (3) these issues presented a substantial concern regarding the viability of ChemoCentryx's NDA for avacopan for the treatment of ANCA associated vasculitis; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

116.    The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing ChemoCentryx securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

117.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

118.    The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

119.    When the Individual Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of ChemoCentryx, the Individual Defendants were privy to information regarding the Company's Phase III ADVOCATE trial, and would have been well aware of the study's troubles.

120.    Accordingly, the Individual Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if ChemoCentryx were to be held liable in the Securities Class Action, the Individual Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of ChemoCentryx.

**Allegations Regarding the Individual Defendants as Control Persons**

121.    In acting as alleged above, the Individual Defendants were acting as authorized agents of ChemoCentryx in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

122.    The Individual Defendants were "controlling persons" of ChemoCentryx within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Individual Defendants could be held liable to the plaintiffs in the Securities Class Action.  Were the Company to be held liable in said Securities Class Action, the Individual Defendants would be liable to it for contribution.

123.    Plaintiff hereby derivatively claims such right of contribution on behalf of ChemoCentryx.

## COUNT II

**Against the Individual Defendants for Violations of Section 14(a) of the**

**Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2020 and 2021 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants concerning the Company's risk assessment and management.

126.    The 2020 and 2021 Proxy Statements represent that the Company's Board of Directors engages in overall risk management. Specifically, the 2020 and 2021 Proxy Statements note that:

[o]ur board of directors has responsibility for the oversight of the company's risk management processes and, either as a whole or through its committees, regularly

discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand the company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic and reputational risk.

127.   In fact, and contrary to the Company's claim in its 2020 and 2021 Proxy Statements, the Company's Board did not appropriately oversee the Company's risk management process, allowing repeated false and misleading information to be disseminated concerning the Company's ADVOCATE clinical trial.

128.   In the exercise of reasonable care, the Individual Defendants should have known that the 2020 and 2021 Proxy Statements contained misleading information and/or omitted material information.

129.   The misrepresentations and omissions in the 2020 and 2021 Proxy Statements were material to Company shareholders in voting on the 2020 and 2021 Proxy Statements, specifically related to the votes as to election of Company directors and approval of executive compensation.

130.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 and 2021 Proxy Statements.

## COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

131.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.   The Individual Defendants owed and owe ChemoCentryx fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants, owed and owe ChemoCentryx the highest obligation of good faith, loyalty, and due care.

133.   The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to ChemoCentryx shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

134.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused ChemoCentryx to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to ChemoCentryx and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

135.     As a direct and proximate result of their failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136.     Plaintiff, on behalf of ChemoCentryx, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

137.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ChemoCentryx.

139.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to ChemoCentryx.

140.     Plaintiff, as a shareholder and representative of ChemoCentryx, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

141.     Plaintiff, on behalf of ChemoCentryx, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that Plaintiff may maintain this action on behalf of ChemoCentryx and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to ChemoCentryx the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing ChemoCentryx and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ChemoCentryx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

D. Determining and awarding to ChemoCentryx exemplary damages according to proof at trial;

E. Awarding ChemoCentryx contribution from Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:      January 25, 2022              **REICH RADCLIFFE & HOOVER LLP**
                                          By: /s/ Adam T. Hoover
                                          Adam T. Hoover

                                          **LIFSHITZ LAW LLP**
                                          Joshua M. Lifshitz
                                          Attorneys for Plaintiff